**Angus B. MacQUEEN and Dolena MacQueen, Plaintiffs,**

v.

**CG–40527, a ship of the U. S. COAST GUARD, United States of America, and National Gypsum Company, Defendants.**

**NATIONAL GYPSUM COMPANY, Cross-Claimant,**

v.

**CG–40527, a ship of the U. S. COAST GUARD, United States of America, Cross-Claimee.**

**Civ. A. No. 2781.**

United States District Court
E. D. Michigan, N. D.

June 19, 1968.

Admiralty Section, Dept. of Justice, Washington, D. C., for defendants.

McCreary, Hinslea & Ray, by John D. Kellener and John H. Hanninen, Cleveland, Ohio, and Henry A. Pominville, Lambert, Leser & Pominville, Bay City, Mich., for National Gypsum Co.

## OPINION

ROTH, District Judge.

Plaintiff Angus MacQueen filed this action against defendant National Gypsum Company, the employing shipowner, under the Jones Act, Title 46, U.S.C., Section 688, and against defendant United States under the Suits in Admiralty Act, Title 46, U.S.C., Section 742 et seq., the Tort Claims Act, Title 28, U.S.C., Section 1346(b), and Title 14, U.S.C., Section 88, relating to Coast Guard rescue operations, seeking damages for the alleged negligent failure to provide medical care and the alleged negligent failure to carry out a rescue mission.

The plaintiff was a master mariner who had been in the employ of the defendant National Gypsum Company and its predecessors for over eleven years. At the time of the incidents with which we are concerned, he was sailing as master in command of the Steamer E. M. Ford on his last season before compulsory retirement.

While docked in Alpena, he entertained his wife, his son, and his daughter-in-law in the quarters aboard the vessel from about midnight until two o'clock the morning of July 16, 1964. To his own family, he appeared to be his usual self and neither indicated nor appeared to be unwell or indisposed. Some two hours later, or about four o'clock in the morning, Captain MacQueen piloted the vessel out of Alpena, bound on a voyage to Waukegan, Illinois. Wheelsman Kirchoff was at the wheel of the vessel when it was piloted out of Alpena by the Captain. He had known the Captain since 1949. On previous occasions he had heard the Captain say that he wasn't feeling well and understood that he was having gall bladder trouble and

C. Robert Beltz, Benton, Hicks, Beltz & Behm, Flint, Mich., for plaintiffs.

Lawrence Gubow, Detroit, Mich., by Robert E. Hamel, Asst. U. S. Atty., Bay City, Mich., and Thomas F. McGovern,

sometime during the passage from the Alpena Dock and the Alpena Channel Buoy, on the morning in question, the Captain said something to indicate he was not feeling well. Apparently being apprehensive, Kirchoff went below to the Captain's quarters at about 7:30 that morning to see how he was. Kirchoff suggested that plaintiff leave the vessel, but the Captain replied that he didn't think it necessary, that he had left orders with the Third Mate to call him at 11:30, and that he would get up for lunch and "I will be all right." This conversation, together with his observations of the Captain, left Kirchoff reassured that there was no cause for alarm. At about 9:30 in the morning, the Captain came part way up to the pilot house and conversed briefly with the Third Mate, Gordon Tremaine Burke; he was rubbing his right arm and said he thought he had a slight stroke. Burke suggested that he get off the vessel, but the Captain replied that he didn't think he would.

The Second Mate, James E. Daleski, relieved Third Mate Burke at 11:50. Some time after Daleski took over the watch, the Captain appeared on the stairs leading to the pilot house and said he wanted Daleski to call the Coast Guard at Mackinac Island to intercept the vessel and have him taken ashore to Mackinaw City and to contact Alpena and have them notify Mrs. MacQueen to meet him at Mackinaw City.

Second Mate Daleski made calls to the Coast Guard and to Mr. Meggert at Alpena. The log entries aboard ship and the Coast Guard do not match so far as they relate to the communications between them concerning the call for assistance. The only way in which such discrepancies and the testimony of the witnesses can be reconciled and fit the time table of other undisputed facts are to conclude that the entries made by Daleski as to the calls to Alpena and the Coast Guard are in error by one hour; that is the log should record the calls to Alpena and the Coast Guard to have been made at 1300 and 1310, instead of

1400 and 1410. The interval between the call to the Coast Guard at 1310 and the time the Captain was put ashore at Mackinaw City is thus fully accounted for. In turn, this means that the call relayed from the vessel to Mrs. MacQueen by Mr. Meggert must have taken place shortly after one o'clock in the afternoon.

After making the calls, Daleski went down to see the Captain and informed him that he had made both calls. Following this, Daleski wakened First Mate Stone and told him that the Master was getting off the vessel. It appears from the evidence that there were other contacts between Daleski and the Coast Guard, but apparently Daleski did not log incoming calls.

The Coast Guard launch reached the Ford at 1435 and took the Captain aboard. The Captain had packed his own luggage, walked half the length of the deck to the ladder, climbed over three cables on the side of the ship, and down the ladder eight feet or so into the launch—all without any assistance. Once aboard the launch, the Captain conversed with at least two members of the crew, refused an offer to lie on a cot, gave certain information to the signalman concerning his condition, saying that he had lost feeling in his hands, went out on deck and sat on the engine cover, and engaged in small talk about the launch.

Arriving at Shepler's pier in Mackinaw City at 1503, the crew offered him further assistance which he refused; he said he didn't want any help. He walked away from the Coast Guard boat carrying his luggage and was seen entering the parking area adjacent to the pier. The launch then left and returned to its station at Mackinac Island.

Mrs. MacQueen testified that the Captain had been receiving medication for high blood pressure for some time before the day in question, but that otherwise, so far as she knew, he was in good health. Upon receiving the call from the Alpena station of the Company, she got ready, stopped at a gas station to

have the car serviced, and called her son and asked him to meet her at the highway seven miles north of Alpena. Her son was living in a cottage at Long Lake. It appears that the driving distance between Alpena and Mackinaw City is about 99 miles, and the driving time was estimated at between an hour and a half and two hours.

When Mrs. MacQueen and her son arrived in Mackinaw City, they saw the Captain at the "bus station," across from the parking area adjacent to Shepler's pier, leaning against a lamp post with his luggage beside him. He had a handkerchief in his hand and looked ill. When asked how he felt he began to cry; and with assistance, he got into the back seat of the automobile. Some time after departing for Alpena, Mrs. MacQueen noticed that the Captain could not use his right hand, and later she noticed that he could not talk. They drove to Cheboygan and stopped at a gas station and called for an ambulance, which soon arrived and the plaintiff was taken by ambulance to the Alpena Hospital where he received conservative care, and where the cerebral vascular accident he was undergoing completed its course.

In considering the evidence so far as it bears on the issue of liability, as it involves either or both defendants, we must remember that this is not the case of an ordinary seaman, injured or ill; that the person here involved was the Master of the vessel. Angus MacQueen remained in command of the Steamer E. M. Ford and all aboard her until he left the vessel and boarded the Coast Guard launch. The most striking and tragic illustration of his command as Master can be found in the sinking of the Cedarville, in the Straits of Mackinac in 1965, not far from the place where Captain MacQueen was transferred from his ship to the Coast Guard launch. As said by United States District Judge Connell in that case (Petition of Den Norske Amerikalinje A/S, 276 F.Supp. 163, N. D.Ohio, 1967):

"In the maritime field, therefore, there must be abject obedience to or-

ders from the moment the seaman enters service until his discharge. It is settled that this condition of the seaman's contract is a singular exception to the Thirteenth Amendment's prohibition against involuntary servitude."

The form of shipping articles which the Master and every member of the crew must sign prior to a voyage has been carefully prescribed by Congress, and these articles contain this promise:

"And the said crew agree * * * to be obedient to the lawful commands of the said master * * * and their superior officers in everything relating to the vessel, * * *."

The authority of the Master as recognized by general maritime law and the shipping articles are further buttressed by those sections of the Federal Code dealing with incitation of seamen to revolt or mutiny and revolt and mutiny of seamen. Sections 2192 and 2193, Title 18, United States Code. There is nothing in the record to even suggest that his subordinates aboard ship in any way failed or refused to comply with the Captain's orders or directions. On the contrary, there is clear and convincing evidence that they did as he commanded. The Coast Guard personnel in this regard treated the Captain in keeping with his position.

It is the duty of a vessel to care for a seaman who is taken ill or receives an injury on a voyage in the service of the ship to the extent of providing medical care and attendance, and if possible, a cure, at the expense of the ship. It is further required, where circumstances warrant it, that the Master shall exercise a reasonable judgment as to putting into the nearest available port, in order that proper treatment may be secured. Exercising his judgment, the Captain made just such arrangements and took such steps in this case.

In this case, from the time the Captain first made known that he wasn't feeling well, until he left the Coast Guard launch at Mackinaw City, all those in contact with him aboard ship or

launch were solicitous of his welfare, and each offer of assistance, over and above that which he received, was refused.

What we are faced with is whether, despite the Captain's directions and orders, his subordinates or the Coast Guard personnel should have adopted a course of action opposed to them. Given a set of circumstances differing from that before us, either might have been justified in, or perhaps even required to, disregard his wishes and pursue a different course of action. Albeit there is serious doubt here that any course of action would have prevented what apparently was in progress so far as his condition was concerned. But more of that later.

In considering whether any of the personnel here involved was or was not fully careful, we are bound, so far as possible, to put ourselves in their places. The record is clear on the point that no one aboard ship or aboard launch knew that the Captain was suffering from hypertension. If the Captain, a man of mature age, of considerable experience, and of at least average intelligence, and possessed of the knowledge that he had high blood pressure, did not understand the serious nature of his condition, how can fault be fairly imputed to his subordinates on the vessel, and the strangers aboard the Coast Guard launch?

Plaintiff's argument that had the rendezvous taken place at a point farther from Mackinaw City, the Captain would have been deposited at that city an hour earlier fails to take into account that the Coast Guard launch would have had that much farther to travel. The actual saving of time, i.e., the difference between craft going toward each other at speeds of 12 and 18 miles per hour would amount to a matter of a few minutes; and the hypothetical advantage obtained would have been more than off-set by the greater exposure of the ill man to rigours of traveling in a small craft as opposed to a large freighter.

The claims of the plaintiff as to the ship is that its officers should have rec-ognized the condition of the Captain as involving a stroke, and as to the Coast Guard that they too should have recognized it, or alternately that they received information sufficient to alert them to his condition. The difficulty with this position is that they would have had to have powers of clairvoyance. It is true that Captain MacQueen suffered a cerebral thrombosis, but as Doctor Farley, an experienced neuro-surgoen, testified he knew of no medical treatment which could have been given the Captain during the afternoon of July 16 which would have averted the cerebral vascular accident which he sustained. He could not say that the walk from the pier to the bus station had any effect on the stroke in evolution and was convinced that a worsening of the condition occurred at the bus station.

■ The personnel of the ship and of the Coast Guard were not physicians and did not have, and were not required to have, the skill or discernment of a surgeon. One cannot say that what they did was unreasonable or improper or negligent, keeping in mind such limited knowledge as may be justly attributed to them. The conclusion is inescapable that each treated the Captain with such care as he permitted. The law imposes on the officers of a ship a duty to exercise reasonable care to furnish such aid as ordinarily prudent persons would under similar circumstances to an injured or ill seaman; and the vessel will not be held responsible for an error of judgment on the part of officers, if their judgment is conscientiously exercised with reference to existing conditions. Sawyer v. California Tanker Co., D.C., 147 F.Supp. 324; The Van Der Duyn, 2 Cir., 261 F. 887; McGuire v. Mutual Transit Co., D.C., 257 F. 360.

■ The Coast Guard may undertake a rescue mission; and once undertaken and having engendered reliance thereon, it has an obligation to use reasonable care in carrying it out. United States v. DeVane, 5 Cir., 306 F.2d 182; Title 14, U.S.C. 88(a) (1). The Court is of the

opinion that the Coast Guard fully discharged its duty.

■ The Court is unpersuaded that Captain MacQueen's condition was brought about or worsened through any fault, neglect or delinquency of the ship, her officers, or Coast Guard personnel. On the contrary, we are persuaded that all were most attentive and considerate of his welfare. The Court finds, in favor of the defendants, no cause for action. The foregoing shall constitute the Court's findings of fact and conclusions of law.

An appropriate order may be submitted.